IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| CELANESE ACETATE, LLC,<br>    Plaintiff,<br><br>v.<br><br>MID-ATLANTIC REGIONAL JOINT<br>BOARD, LOCAL 2024<br>Serve: Rick Bailey, President<br>P.O. Box 264<br>Narrows, VA 24124<br><br>and<br><br>MID-ATLANTIC REGIONAL JOINT<br>BOARD, LOCAL 1995<br>Serve: Chad McCroskey, President<br>P.O. Box 264<br>Narrows, VA 24124<br><br>    Defendants. | Civil Action No. 7:23cv00044 |

## COMPLAINT TO VACATE ARBITRATION AWARD

Pursuant to Rule 7 of the Federal Rules of Civil Procedure, Plaintiff Celanese Acetate, LLC ("Plaintiff," "Celanese" or "the Company"), by counsel, brings this action under Section 301 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 185 ("LMRA"), to vacate a labor arbitration award issued in favor of Defendants Mid-Atlantic Regional Joint Board Local 2024 ("Local 2024") and Mid-Atlantic Regional Joint Board Local 1995 ("Local 1995").[1] As grounds for this Complaint, Plaintiff alleges as follows:

---

[1] The underlying arbitration case is styled, *Rick Bailey and Chad McCroskey, Mid-Atlantic Regional Joint Board, Local 1995 & Local 2024 and Celanese Acetate* (AAA Case No. 01-22-01-2835).

## Parties

1. Celanese is a Delaware Limited Liability Company with its principal place of business located in Dallas, Texas. As it pertains to this dispute, Celanese operates one of the largest cellulose manufacturing facilities in the world, which is located in Narrows, Virginia (hereinafter the "Narrows Plant").

2. Defendant Local 1995 is a labor union within the meaning of 29 U.S.C. § 152(5) that represents certain Narrows Plant employees pursuant to a collective bargaining agreement with the Company.

3. Defendant Local 2024 is a labor union within the meaning of 29 U.S.C. § 152(5) that represents certain Narrows Plant employees pursuant to a collective bargaining agreement with the Company.

4. Defendants Local 1995 and Local 2024 are referred to, collectively, as the "Unions."

## Jurisdiction and Venue

5. This Court has jurisdiction over this matter pursuant to Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), and 28 U.S.C. § 1331.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and 29 U.S.C. § 185(c).

## Factual Allegations

*a. Company background and relevant information about the Narrows Plant and its Unions.*

7. Celanese is a global technology, chemical, and specialty materials company that engineers and manufactures a variety of products.

8. Since 1939, Celanese has operated the Narrows Plant, which is, at various times, one of the largest cellulose manufacturing facilities in the world. The Narrows Plant currently employs approximately 600 employees.

9. The Narrows Plant manufactures cellulose derivatives in both flake and tow forms. In its several forms, cellulose is a fiber with various uses and is a critical component in a myriad of products, most notably in cigarette filters. Deceptively simple in its end form, manufacturing cellulose requires complex processes that necessitate a highly skilled and technical workforce. As a result, jobs at the Narrows Plant require highly skilled employees with extensive training, who work in close proximity in a manufacturing environment.

10. The Company and the Unions have been parties to a series of collective bargaining agreements that have set forth the terms and conditions of employment for bargaining unit members at the Narrows Plant.

11. Historically, hourly employees at the Narrows Plant were represented exclusively by Local 2024. And, for a time, the on-site power station at the Narrows Plant was operated by a third party. However, in and about 2011, Celanese reclaimed operation of that power station, bringing operations in-house. In the course of that process, Local 1995 was created to represent employees hired or rehired to work in the newly created Utilities Department for the Company.

12. Local 1995 serves as the exclusive bargaining agent for hourly production and maintenance employees at the on-site power station at the Narrows Plant. As it pertains to this dispute, Local 1995 represented approximately 48 employees. The current collective bargaining agreement between the Company and Local 1995 (the "Local 1995 CBA"), attached as **Exhibit 1**, runs from April 12, 2020 through April 13, 2025.

13. Local 2024 serves as the sole bargaining agent for all other hourly production and maintenance employees at the Narrows Plant. As it pertains to this dispute, Local 2024 represented approximately 400 employees. The current collective bargaining agreement between the Company and Local 2024 (the "Local 2024 CBA"), attached as **Exhibit 2**, runs from April 12, 2020 through April 13, 2025.

14. The Local 1995 CBA and Local 2024 CBA are referred to, collectively, as the "Agreements" or "CBAs."

**b. Celanese implements a COVID-19 surcharge for all U.S. employees, including those represented by the Unions, in compliance with the CBAs.**

15. Celanese provides health benefits and certain other fringe benefits to eligible employees and their eligible dependents pursuant to Company's Health Care Plan (the "Plan"), which is a welfare benefit plan subject to the Employee Retirement Income Security Act of 1974 ("ERISA") and other applicable statutory and regulatory requirements.

16. Article 22 of the CBAs contain a "me-too" provision relating to health insurance coverage, requiring union employees to participate in the Plan "***in the same manner as all other Celanese U.S. based staff and hourly employees***." (*See* **Exhibit 1** at 27 (emphasis added); **Exhibit 2** at 27 (emphasis added).)

17. An overview of many, but not all, terms and conditions of the Plan are outlined in summary plan descriptions ("SPDs") provided to union and non-union employees. Notably, the SPDs specifically state that the Plan may be modified "at any time and for any reason" at the Company's "sole discretion." (*See* Summary Plan Description, attached as **Exhibit 3,** at 119-20; Cafeteria Plan Summary Plan Description, attached as **Exhibit 4**, at 7.)

18. Naturally, the SPDs cannot communicate every term, condition, benefit or detail relating to the Plan. Thus, many benefits, terms, and/or conditions of the Plan are provided in and

4

communicated through other "benefits materials," such as open enrollment guides and other periodic communications announcing yearly premiums or changes to the Plan—including the Vaccination Surcharge Q&A dated December 10, 2021, attached as **Exhibit 5**.

19. Since the start of the COVID-19 pandemic, the Company and the Unions have had regular discussions regarding COVID-19 updates, including changes in protocols and policies as dictated by the ever-changing circumstances surrounding the COVID-19 pandemic—e.g., changes in the mask and social distancing policies.

20. In early December 2021, Celanese, along with the rest of the country, was experiencing high levels of COVID-19 infections from the Delta and Omicron variants of the COVID-19 coronavirus. At the time, it was widely understood that vaccination decreased the risk of serious illness and hospitalization. On this basis, the Company decided to implement a $60 per pay period surcharge ("COVID-19 surcharge"), effective February 1, 2022, for unvaccinated employees participating in the Plan. The purpose of this decision was twofold: first, to incentivize vaccination (rather than mandate it), and second, to manage health care costs strategically.

21. Consistent with Article 22 of the CBAs, this change applied equally to union and non-union employees, and the announcement was communicated to all U.S. employees on or about December 10, 2021. (*See* **Exhibit 5**.) Following the announcement, employees were provided the option to opt out of the Plan if they wished to remain unvaccinated and avoid paying the surcharge.

22. Although open plan enrollment had closed on or about November 17, 2021, at that time, Celanese had not yet decided to implement the COVID-19 surcharge, thus its exclusion from open enrollment materials was purely a product of the ever-changing circumstances surrounding the COVID-19 pandemic. Notwithstanding, Celanese distributed benefits materials about the COVID-19 surcharge and opt-out option to employees in December 2021—once it decided to

implement the COVID-19 surcharge, again, based on surging COVID-19 numbers from the Delta and Omicron variants of the COVID-19 coronavirus.

23. When circumstances surrounding the COVID-19 pandemic changed (yet again), the surcharge was withdrawn effective July 1, 2022.

### c. *Both Unions grieve implementation of the COVID-19 surcharge, resulting in a consolidated arbitration after their grievances are denied.*

24. Local 2024 subsequently grieved implementation of the COVID-19 surcharge—its grievance stated as follows:

> In December, the union was informed of a surcharge for unvaccinated employees. The union contested this unilateral change and requested bargaining to find alternative options. And [sic] to re-open enrollment for employees to change options.

Celanese responded to Local 2024's grievance and denied it on grounds that: the COVID-19 surcharge fell within the Plan; a corresponding modification to bargaining unit employees' Health Care Plan was not only permissible, but <u>explicitly required</u> by the terms of the Local 2024 CBA; and bargaining over implementation of surcharges is not required under the Local 2024 CBA.

25. Local 1995 also grieved implementation of the COVID-19 surcharge—its grievance stated as follows:

> In receipt of the company's new covid [sic] surcharge announcement, The [sic] union believes the company is in violation of the contract. The union believes surcharges are to be negotiated due to past practice in Last Best Final of 2017. The union also believes the complaint is violation of the contract Article 22 sections (E)(1) as open enrollment has already passed, and any other articles that may apply.

Celanese responded to Local 1995's grievance and denied it on grounds that: the COVID-19 surcharge fell within the Plan; a corresponding modification to bargaining unit employees' Health Care Plan was not only permissible, but <u>explicitly required</u> by the terms of the Local 1995 CBA; bargaining over implementation of surcharges is not required under the Local 1995 CBA; Article

22 (E)(1) of the Local 1995 CBA does require implementation of surcharges during open enrollment; and any suggestion of a past practice negotiated surcharges in "Last Best Final of 2017"[2] is contradicted by the terms of that document.

26. Arbitration ensued after the parties were unable to resolve the matter through the grievance procedure articulated in the CBAs.

27. On July 22, 2022, a hearing was held before Arbitrator Samuel Spencer Stone in Christiansburg, Virginia.

28. On October 25, 2022, Arbitrator Stone issued his Decision and Award (the "Award"), attached as **Exhibit 6**, substantiating the Unions' grievances on grounds that the COVID-19 surcharge was "instituted improperly."

**d.  The Award does not draw its essence from the CBAs, and otherwise reflects the Arbitrator's own brand of industrial justice.**

29. The Award ignores the plain language of Article 22 of the CBAs.  The CBAs do not prohibit surcharges, nor do they require bargaining for changes to the terms or conditions of the Plan.  Indeed, the "me-too" provision included in both CBAs provides that union employees shall participate in the Plan "***in the same manner as all other Celanese U.S. based staff and hourly employees***."  (**Exhibit 1** at 27 (emphasis added); **Exhibit 2** at 27 (emphasis added).)

30. The Award erroneously concludes that because the "surcharge was instituted after the open enrollment period" (and, thus, after open enrollment materials were distributed), employees did not receive "benefit materials" as required under the CBA.  (*See* **Exhibit 6** at 20-21.)  As an initial matter, the CBAs do not require Celanese to announce all changes to the Plan during the open-enrollment period—and there is no prohibition against mid-year modifications to

---

[2] A copy of the referenced document is contained in the Local 1995 CBA. (*See* **Exhibit 1** at 41-44 (with emphasis on page 43 – "Settlement of Medical Arbitration").)

the Plan. Indeed, the SPDs—which are incorporated into the CBAs by reference—specifically state that the Company "reserves the right to discontinue, alter or modify the Plan in whole or in part, ***at any time*** and for any reason, at its sole discretion." (**Exhibit 3** at 119 (emphasis added).) In addition, the CBAs do not define "benefits materials" as being limited to materials distributed during open enrollment.

31. Notably, the evidentiary record before the Arbitrator clearly established that Celanese distributed benefits materials containing information about the COVID-19 surcharge and the opt-out option after it announced its decision to implement the COVID-19 surcharge. Furthermore, Celanese presented evidence at the hearing that the surcharge announcement constituted "benefits materials" related to the Plan at issue.

32. Because Celanese instituted a COVID-19 surcharge for its non-union U.S. based staff and hourly employees in December 2021, a corresponding modification to bargaining unit employees' Health Care Plan was not only permissible, but <u>explicitly required</u> by the terms of the Agreements.

## CAUSE OF ACTION

33. Plaintiff incorporates and re-alleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

34. If enforced, Arbitrator Stone's Award violates the public policies of the Commonwealth of Virginia and United States of America. Indeed, the Award conflicts with public policy interests to the extent that it undermines the expectation of enforcement of a bargained-for collective bargaining agreement.

35. In sustaining the grievance and in ordering the relief found in the Award, Arbitrator Stone exceeded the authority granted to him under the CBAs.

36. Arbitrator Stone's Award does not "draw its essence" from the CBAs in that:

    (a) The Award is without rational support and cannot be rationally derived from the Agreements;

    (b) The Award is arbitrary and capricious, and in manifest disregard of the law;

    (c) The Award imposes additional requirements upon the Company not expressly provided for in the Agreements;

    (d) The Award impermissibly modifies the terms of the Agreements;

    (e) The Award conflicts with the express terms of the Agreements and the documents incorporated therein;

    (f) The Award is not based on the precise terms of the Agreements; and

    (g) The Award applied a burden of proof that is unreasonable—and, in doing so, the Arbitrator inappropriately dispensed his own brand of industrial justice.

**WHEREFORE,** the Plaintiff Celanese Acetate, LLC respectfully requests that this Court:

1. Vacate the Arbitrator's Award, *with prejudice*; and

2. Grant such further and additional relief as this Court deems just and proper.

*Dated this 20th day of January, 2023*

                                        Respectfully submitted,
                                        **CELANESE ACETATE, LLC**

                                        By:  */s/ J. Clay Rollins*
                                               J. Clay Rollins (VSB No. 84382)
                                               Clay.rollins@ogletreedeakins.com
                                               W. Ryan Waddell (VSB No. 91148)
                                               ryan.waddell@ogletreedeakins.com
                                               OGLETREE, DEAKINS, NASH, SMOAK &
                                               STEWART, P.C.
                                               901 East Byrd Street, Suite 1300
                                               Riverfront Plaza, West Tower
                                               Richmond, VA  23219
                                               Telephone: (804) 663-2332
                                               Fax: (855) 225-8641

                                               *Counsel for Plaintiff*